**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Reid Lininger,                                           Case No. 3:16CV2853

                Plaintiff

        v.                                           **ORDER**

St. Marys City School District
Board of Education, *et al.*,

                Defendant

 

This is a gender discrimination case.

Plaintiff Reid Lininger, a former St. Marys Memorial High School football player, alleges that his coach, defendant Paul Douglas Frye, sexually harassed him. He claims that Frye regularly insulted him, calling him "pussy," "pretty boy," and other derogatory terms, and that these insults targeted his masculinity. He also brings claims related to Frye's hiring and an internal complaint his father and others made about Frye.

Lininger alleges defendant St. Marys School District Board of Education (the Board) discriminated against him under Title IX, 20 U.S.C. §§ 1681, *et seq.* He also claims that the Board, Frye, St. Marys Superintendent Shawn Brown, and St. Marys Athletic Director James Hollman violated his constitutional rights to equal protection and substantive due process.

Lininger also raises state law claims. He brings claims against all defendants for "gross negligence, bad faith, reckless, wanton and intentional conduct" and against the individual defendants for intentional and negligent infliction of emotional distress. Finally, he raises a negligent hiring claim against the Board.

Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1367(a).

Now pending are two motions for summary judgment: Frye's motion for summary judgment (Doc. 42) and the Board, Brown, and Hollman's motion for summary judgment (Doc. 45). For the following reasons, I grant the motions.

## Background

Frye became the St. Marys head football coach in January, 2014, after previously coaching there from 1999 through 2010. (Doc. 42-8 at 1, ¶ 1).

### A. Frye's 2013 Rehire

Brown led the late-2013 search for a new football coach that resulted in Frye's rehire. As Superintendent, Brown would recommend a candidate to the Board, which would vote on the recommendation. (*See* Doc. 40 at 60-61).[1]

In his search, Brown sought a candidate who could restore success to the St. Marys football program after several struggling seasons. (*See id.* at 102). He pursued Frye because Frye was successful previously at St. Marys and in his then-current position in nearby Wapakoneta. (*Id.*). Frye coached winning teams, involved players in the community, and garnered college scouts' attention. (*Id.* at 100).

---

[1] Typically, the Athletic Director would interview coaching candidates and recommend a selection to the Superintendent. Brown testified that because Hollman was in his first year as Athletic Director at the time of the football coach search, and due to the football coaching role's high-profile nature, he decided to conduct the search himself. (*See* Doc. 40 at 62-64).

Frye's record was not unblemished. He had a reputation for being tough on his players, including using profanity and calling them names. This resulted in complaints from players and parents as well as disciplinary action against Frye, including:

- A 1995 disciplinary letter from the Superintendent of Frye's then-employer, Bucyrus City Schools, for cussing at a player (*see id.* at 13-14);

- A 1999 complaint, which Hollman[2] and two other assistant coaches wrote, to the Board that Frye cussed too much at players and allowed them to play through injuries (*see* Doc. 35 at 34-36);

- A 1999 St. Marys coaching evaluation instructing Frye to refrain from cussing or using degrading language toward players (*see* Doc. 40 at 46-47);

- A 2012 Wapakoneta assistant coach's audio recording of Frye swearing at players and calling them names such as "losers," "dumbasses," "worthless," and "pussies" (*see id.* at 39);

- Statements Wapakoneta players made to police in response to the 2012 audio recording (*see id.* at 183);

- A written reprimand from the Wapakoneta Superintendent in response to the 2012 audio recording (*see id.* at 41); and

- A 2013 consent agreement with the Ohio Department of Education requiring Frye to submit quarterly reports about his behavior and treatment of students throughout the 2014-15 season. (Doc. 40-1 at 6-10).

Despite his disciplinary history, Frye had his supporters. For example, Bucyrus parents wrote a letter supporting Frye and his methods in response to the 1995 reprimand. (*See* Doc. 42-8 at 12-14). Likewise, the Bucyrus principal and athletic director wrote letters of recommendation to Frye's future employers. (*See id.* at 15, 17). Also, Frye won Ohio District III Coach of the Year in 2001 during his first St. Marys tenure. (*See id.* at 18).

---

[2] Hollman was an assistant coach to Frye during the 1999 season at St. Marys. Hollman eventually quit that job because of the conduct cited in his complaint. (Doc. 35 at 31-32). He returned to St. Marys in 2000 and coached under Frye from that time until Frye left St. Marys. (*Id.* at 29-30).

Brown admits knowing about some, but not all, of Frye's disciplinary record. He considered the complaints against Frye resolved because Bucyrus, St. Marys, and Wapakoneta continued to employ him for, respectively, approximately four (*see* Doc. 40 at 21), ten (*id.* at 95), and two (*id.* at 45) years. He acknowledged that he neither requested nor reviewed Frye's prior coaching evaluations or his personnel file. (*Id.* at 48-49).

Brown explains that he took steps to investigate Frye's record. He spoke with both the previous St. Marys Superintendent (who wrote the 1999 evaluation) and the Wapakoneta Superintendent about Frye. The St. Marys Superintendent told Brown that he thought hiring Frye was a good decision. (*Id.* at 48). The Wapakoneta Superintendent told Brown about the audio recording but did not supply additional information. Frye disclosed the consent decree to Brown in a pre-interview meeting about the coaching position. (*Id.* at 77).

During the hiring process, three parents, including Lininger's father, encouraged Brown to recommend Frye to the Board. (*Id.* at 70). Yet, Brown received emails from at least two community members expressing concern about hiring Frye. (*See id.* at 91-95, 128-30; Doc. 40-1 at 12-15).

Brown interviewed only Frye for the head coaching job. After the interview and reviewing Frye's information, Brown recommended Frye for the role. (*See* Doc. 40 at 69-70).

Hours before the meeting when the Board would vote on the head coaching job, a Board member received information about Frye's record, including the Wapakoenta recording. (*See* Doc. 40-1 at 18). The Board members convened an executive session to discuss the information. In the meeting's public session, a community member spoke out with concerns about Frye's background. (Doc. 40 at 85-87).

Despite the concerns raised at the Board meeting, the Board approved Frye for the head coaching job. In light of the concerns about Frye's background, Hollman, and, occasionally, Brown, monitored his behavior. (Doc. 40 at 57).

## B. Lininger's Career and Frye's Coaching

Lininger began playing football for St. Marys as a freshman in the Fall of 2013. (*See* Doc. 39 at 17-18). His sophomore season was Frye's first back at St. Marys. (*Id.* at 220). Lininger was the starting junior varsity quarterback and the backup varsity quarterback. He practiced with the varsity team but rarely played quarterback in varsity games – and never did so after Frye became head coach. (*Id.* at 19, 47-48).

Frye regularly criticized Lininger during practices, sometimes in front of the whole team. (*See id.* at 27-28). Almost daily, he insulted Lininger, calling him "pussy" (*id.* at 60), "spoiled rich pretty boy pussy" (*id.* at 40), "bitch" (*id.* at 270), "soft" (*id.* at 26-27), "entitled" (*id.* at 40), or some combination of those terms.

Frye called Lininger names for myriad reasons. For example, he called Lininger a pussy being afraid to take a hit or throwing the ball away too quickly (*see id.* at 88-89) and for missing practice time due to injury (*id.* at 89-91). He also told Lininger, in front of others, that Lininger "think[s he is] better than [other] people" because he attended a football camp (*id.* at 41). Frye made an example of Lininger, telling the team, "[Y]ou'll never win with players like Reid," or "[Y]ou guys need to work harder or you could be a waste of talent like Reid." (*Id.* at 61).

Some of Lininger's teammates joined in Frye's insults, calling him "pussy," "soft," and otherwise insulting his playing abilities. (*Id.* at 58-59).

Though he preferred not to talk about how Frye treated him, Lininger occasionally told his parents about Frye's behavior. Usually, his father told him "just to keep working hard," (*id.* at

62). His mother, however, believed Frye bullied Lininger and, in August, 2014, tried to learn how to file a complaint against Frye. (Doc. 31 at 59-60, 70). She gave up her efforts after calling Hollman, Brown, and another Board member, Travis Kuenning, did not yield the formal complaint procedure she sought.[3] (*Id.* at 59-70).

At some point in the Fall of 2015, during Lininger's junior season, coaches moved him to a receiver position because he never played varsity games at quarterback. (Doc. 39 at 45).

### C. 2015 Complaints About Frye

On October 23, 2015, the football team voted to remove Lininger's teammate, Dane Chisholm,[4] from the team. Chisholm's removal set in motion an effort, which Chisholm's father led, to lodge a complaint against Frye. On October 24, 2015, Chisholm's father called Lininger's father, who complained that Frye "emotional[ly] abuse[d]" Lininger, "embarrass[ed] him," and "treate[ed] him unfairly and disrespectfully." (Doc. 34 at 21; Doc. 37 at 29).

Around the time of the fathers' call, Chisholm's father drafted a questionnaire inquiring about team members' experiences with Frye, which he hoped would corroborate Chisholm's gripes about Frye. (Doc. 37 at 23-25). Chisholm asked approximately seven team members to respond to the questionnaire. Four team members agreed. (Doc. 37 at 36; Doc. 33 at 217). Chisholm did not ask Lininger for a response, and Lininger did not provide one. (Doc. 33 at 217; Doc. 34 at 47; Doc. 39 at 65). Lininger had told his father that he "didn't want to be involved." (Doc. 39 at 65).

---

[3] Kuenning offered to arrange a meeting with Frye so the mother could address her grievances with him. She declined the offer. (Doc. 31 at 61-63, 68).

[4] On December 26, 2018, I granted summary judgment against Chisholm on his similar claims against the defendants. *See Chisholm v. St. Marys Sch. Dist. Bd. of Educ.*, 2018 WL 6788491 (N.D. Ohio) (Carr, J.).

In the meantime, Chisholm's father and Lininger's father met with other parents to discuss Frye's behavior. They decided to contact an attorney, who prepared a letter complaining about Frye to Brown and Hollman. (Doc. 34 at 12-13).

### 1. The December, 2015 Complaints

The letter, dated December 18, 2015, complained that "Doug Frye and his staff members have harassed, intimidated and hazed student athletes." The letter asked the Board to investigate Frye and "remove [him] and his staff from coaching and teaching." (Doc. 34-1 at 1). Chisholm and Lininger's fathers signed the letter. (*See id.*).

On December 22, 2015, Brown and Hollman met with the fathers and their attorney. At the meeting, the fathers presented Brown with questionnaire responses from Chisholm and two other students.[5] The students' responses complained that Frye called them and their teammates names, including "bitch," "asshole," "pussycake," "cancer," "dumbass," "douchebag," and "idiot loser." They also complained that Frye ignored injuries and claimed that concussions are not real, encouraged players to fight one another, and sometimes required full-contact practice without pads. (*Id.* at 2-7).

Brown advised Frye about the complaints against him and disclosed to him the names of the complaining parties. (Doc. 40 at 213-14).

Around the same time that the fathers submitted their complaint to the Board, they also sent a complaint about Frye to the Ohio Department of Education (ODE). (Doc. 34 at 172).

---

[5] I will collectively refer to the fathers' letter and the students' questionnaire responses as the December, 2015 complaints.

## 2. The Board's Investigation and Results

On receiving the complaints, the Board began an investigation. On its attorney's recommendation, the Board hired Ted Knapke, Ph.D. to lead the investigation. Dr. Knapke is a former school superintendent and a former director of the Education Service Center, which put on programs for aspiring superintendents and collaborated on strategic planning with school districts. The attorney recommended Dr. Knapke because he had done a school investigation for another lawyer at the attorney's firm. (Doc. 55 at 15-16; Doc. 40 at 191-92).

After developing a set of interview questions, Dr. Knapke interviewed eleven players, some of their parents, and "the team doctor, the team trainer, and most of the coaches."[6] (Doc. 55 at 15; *see also* Doc. 42-8 at 6). Dr. Knapke did not interview Lininger or his father. (Doc. 39 at 65).

### a. The Investigator's Findings and Recommendations

Dr. Knapke summarized his two-day investigation in a January 27, 2016 report. (Doc. 42-8 at 6-11). He explained that the allegations against Frye, if true, would warrant "significant changes in the program/personnel." He concluded, however, that "[t]he investigation clearly did not bear out the allegations." (*Id.* at 11).

Indeed, Dr. Knapke explained, "the interviews of the eight students who did not submit [questionnaire responses] and those members of the coaching staff did not corroborate the allegations in the [responses]." (*Id.* at 10). Specifically, he found that "[b]oth coaches and students acknowledge that . . . swearing does occur at times, however, there is no evidence that it is out of line by most standards." (*Id.*). He also explained that his interviews with the team

---

[6] Knapke's report notes that he interviewed eleven athletes: the three who completed the questionnaire and eight who did not. (*See* Doc. 42-8 at 6).

doctor and trainer and parents of injured players confirmed that the coaches properly administered the injury protocol. (*Id.*).

Dr. Knapke ended his report with two recommendations: 1) the coaching staff should "[c]ontinue to communicate the injury protocols . . . with players and parents from the very start of the season" and (2) Hollman should "remain closely involved with" the football program. Specifically, Dr. Knapke recommended that Hollman learn players' concerns and proactively address potential problems. (*Id.*).

### b. Community Backlash

Shortly after the investigation, Frye's then-attorney posted Knapke's report to a Facebook page for St. Marys football players' parents. The attorney identified the two fathers as the complaining parties and noted that they had filed a complaint with the ODE. (*See* Doc. 55 at 25-28; 55-2 at 11). It is not clear from the record how the attorney accessed the report, whether pursuant to a public records request or otherwise. (*See* Doc. 40 at 222 (Q: Did you [Brown] give that [report] to [Frye's attorney]? A: I did not directly give it to him. He might have done a records request, I don't know.)).

Seeing this, some of the page's members posted comments insulting the fathers, for example, calling them "idiots," and about their sons, for example, calling them "little ass holes." (Doc. 37 at 149-60 (citing Doc. 55-1 at 8-45 (screenshots of Facebook comments)). Some posters included school district employees, such as a keyboarding instructor[7] and school nurse. (*See*, *e.g.*, *id.* at 25, 38; *see also* Doc. 40 at 224, 230-31).

### c. Appeal to the Board

---

[7] The keyboarding instructor is also Frye's wife. (*See* Doc. 40 at 230-31).

In a letter to Brown dated February 8, 2016, the complaining students[8], their parents, and Lininger's father appealed the investigation results. (*See* Doc. 35-3 at 18-20).

The letter complained about the length of Dr. Knapke's interviews, the questions he asked, how Dr. Knapke chose interviewees (*i.e.*, via a list the Board supplied)[9], and Dr. Knapke's failure to consider Frye's disciplinary history. The letter also complained of the community backlash. (*Id.*). The letter to Brown did not reference the St. Marys Anti-Harassment Policy (Harassment Policy), about which Lininger now separately complains because Dr. Knapke failed to apply it. (*See* Doc. 58-1; Doc. 64 at 15-16).

Brown shared the appeal letter with the Board. One Board member suggested conducting a second investigation. No such investigation occurred. (Doc. 40 at 185-89).

### 2. The ODE's Findings

The ODE concluded its investigation in a letter dated April 27, 2017. The letter stated that the ODE "determined that no disciplinary action will be pursued." (Doc. 42-8 at 5).

### D. Lininger Transfers and Graduates

In or about April, 2016, Lininger transferred to nearby Anna High School. (Doc. 39 at 11). He played football (*id.* at 12) and made friends (*id.* at 162) there and graduated in May, 2017. (*Id.* at 186).

---

[8] Here, the complaining students include one additional student who submitted a questionnaire response after the December 22 meeting. That student's parents did not join the appeal. (*See id.*).

[9] The letter did not mention Lininger by name but generally protested Dr. Knapke's failure to "speak to several students [the fathers] identified in the initial meeting as persons with key information." (Doc. 42-8 at 19).

After graduation, Lininger moved to Tampa, Florida to live with his sister. (*See id.* at 8-9, 216). At the time of his deposition, Lininger had applied to work in a restaurant and had researched, but not applied to, some Florida colleges. (*Id.* at 8-9).

## Standard of Review

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323.

The burden then shifts to the nonmoving party to "set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

I accept the non-movant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

## Analysis

### A. Title IX

Lininger claims that the Board violated his rights under Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681, *et seq.* He alleges that he suffered 1) sexual harassment based on gender stereotypes and 2) retaliation for participating in Title IX-protected activity.[10]

---

[10] Lininger also alleged that the Board discriminated against him by handling his complaint against Frye differently than a female student's complaint. (Doc. 1 at 28-29, ¶ 116). The Board points out that Lininger has not produced any evidence to support this claim (Doc. 45 at 21), and Lininger does not even reference that claim in his brief. (*See* Doc. 63). I therefore grant summary judgment on that claim. *See Campbell v. Hines*, 2013 WL 7899224 (6th Cir.).

Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

### 1. Sexual Harassment

To establish a Title IX claim for sexual harassment, Lininger must show:

> (1) that the sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive [him] of access to the educational opportunities or benefits provided by the school, (2) the funding recipient had actual knowledge of the sexual harassment, and (3) the funding recipient was deliberately indifferent to the harassment.

*Patterson v. Hudson Area Schs.*, 551 F.3d 438, 444-45 (6th Cir. 2009) (internal citations omitted); *see also Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 366-67 (6th Cir. 2005) (explaining deliberate indifference standard applicable to peer harassment cases applies in teacher-on-student harassment cases) (citing *Gebser v. Lago Valley Indep. Sch. Dist.*, 524 U.S. 629 (1999); *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999)).

Proving sexual harassment is a two-step process. First, "the student [must show] harass[ment] on the basis of his or her sex." *Tumminello v. Father Ryan High Sch., Inc.*, 678 Fed. App'x 281, 284 (6th Cir. 2017). Second, the student must show that the "harassment [was] so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 634 (1999); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998) (explaining two-step sexual harassment inquiry).

The Board argues that Lininger did not suffer harassment based on his sex. (*See* Doc. 45 at 16-17). Lininger responds that Frye harassed him because he did not conform to male stereotypes. (*See* Doc. 63 at 21-24).

I agree with the Board that Lininger did not suffer sex-based harassment.

"[H]arassment or stereotyping based on a person's gender non-conforming behavior is impermissible discrimination." *Tuminello*, *supra*, 678 Fed. App'x at 284 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250-51(1989)).[11] To succeed on a sex-stereotyping theory Lininger must show that he "did not conform to traditional gender stereotypes in an observable way and that these characteristics were the basis of his harassment." *Id.* at 285-86 (citing *Price Waterhouse*, *supra*, 490 U.S. at 764-65); *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 764 (2006).

Lininger claims that Frye deliberately used terms like "pussy," "bitch," and "pretty boy" to target "stereotypically feminine characteristics" (*see* Doc. 64 at 23; Doc. 39 at 260) and re-enforce "traditional notions of masculinity" (*see* Doc. 1 at 4-5, ¶ 12). He produces no evidence, however, indicating he exhibited gender non-conforming characteristics.

At best, Lininger shows that Frye and his teammates sometimes perceived him as weak or spoiled. *See Doe v. Torrington Bd. of Educ.*, 179 F. Supp. 3d 179, 197 (D. Conn. 2016) (explaining that courts "have found that the terms 'pussy' . . . and 'bitch' are also insufficient to suggest that a student was harassed on the basis of gender"); *see also Oncale*, *supra*, 523 U.S. at 81 ("[Plaintiffs] must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimination* because of sex.'"). Subjective perceptions alone cannot form a gender-stereotyping sexual harassment claim. *See Vickers*, *supra*, 453 F.3d at 763 (finding plaintiff did not suffer sex-based harassment despite his claim that his coworkers called him names like "fag" and "gay" because they perceived him as preferring "traditionally female-or less masculine" relationship roles); *see also Seamons v. Snow*,

---

[11] Courts regularly consult Title VII sex-discrimination jurisprudence for guidance in Title IX cases. *See, e.g.*, *Tuminello*, *supra*, 678 Fed. App'x at 284.

84 F.3d 1226, 1233 (10th Cir. 1996) ("The qualities Defendants were promoting, team loyalty and toughness, are not uniquely male.").

Further undermining Lininger's claim, Frye "called everybody a pussy." (*See* Doc. 38 at 97-98). Frye doled out his insults on an equal-opportunity basis: he spray-shot his name-calling at anyone, not focusing only on Lininger. His words did not single out Lininger for unique, observable, gender non-conforming characteristics.

Because Lininger has not shown that Frye harassed him based on his sex, his claim for Title IX sexual harassment fails.

## 2. Retaliation

Lininger also claims that the Board retaliated against him for exercising his Title IX rights.

Title IX protects individuals who "complain of sex discrimination" from retaliation. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 184 (2005). To demonstrate Title IX retaliation, Lininger

> [M]ust show that (1) he engaged in protected activity, (2) [the Board] knew of the protected activity, (3) he suffered an adverse school-related action, and (4) a causal connection exists between the protected activity and the adverse action.

*Gordon v. Traverse City Area Pub. Schs.*, 868 Fed. App'x 315, 320 (6th Cir. 2017) (internal citation omitted).

The Board argues that Lininger did not engage in protected activity. Rather, the Board argues, Lininger's father[12] merely lodged a general bullying complaint against Frye. (Doc. 45 at

---

[12] Lininger may bring a retaliation claim based on the complaint his father made on his behalf. *See E.E.O.C. v. Ohio Edison Co.*, 7 F.3d 541, 543-44 (6th Cir. 1993).

18-19). Lininger argues that the complaint had a "reasonable basis," earning Title IX's protections. (Doc. 63 at 39).

I agree with the Board that the December, 2015 complaints[13] against Frye were not protected activity.

"[A] vague charge of discrimination . . . is insufficient to constitute" Title IX-protected activity. *See Booker v. Brown & Williamson Tobacco Co.*, 879 F.3d 1304, 1313 (6th Cir. 1989) (explaining that plaintiff's letter complaining of "ethnocism" was not protected activity in race discrimination case).

Courts in this circuit have declined to protect complaints if they do not adequately describe the nature of the alleged legal violation. For example, an employee's letter complaining that "she felt discriminated against and that 'all her team members were younger and some were male'" was not protected activity in an age and sex discrimination case. *See McKinley v. Skyline Chili, Inc.*, 2012 WL 3527222, *9-10 (S.D. Ohio). Likewise, an employee's verbal complaints that he suffered "discriminatory" discipline and that he felt "harassed" and "treated differently" were merely "vague protests." *Pastura v. CVS Caremark*, 2012 WL 6738660, *10 (S.D. Ohio); *see also Porubsky v. Macomb Cmty. Coll.*, 2012 WL 280375, *10-11 (E.D. Mich.) (student's complaint that school treated him differently than similarly performing female classmates not protected activity where complaint did not mention gender discrimination).

In their letter to Brown and Hollman, Chisolm and Lininger's fathers complained generally of harassment. (*See* Doc. 34-1 at 1). Lininger's teammates' questionnaire responses complained of name-calling, including Frye's use terms like "pussy" and "bitch," and of

---

[13] Lininger does not argue that his mother's August, 2014 attempt to file a complaint against Frye was protected activity under Title IX.

"bullying."[14] (*Id.* at 2-7). But the letter and questionnaire responses do not mention sex at all, much less the students' Title IX rights. Such general complaints of harassment do not earn Title IX protection. Lininger therefore fails to meet the first element of his retaliation claim.

### B. Constitutional Claims

Lininger raises constitutional claims under 42 U.S.C. § 1983 against all defendants. Section 1983 provides a claim for relief against individuals who, acting "under color of" state law, violate a plaintiff's federal constitutional or statutory rights.

Lininger alleges that the individual defendants denied him equal protection and that all defendants violated his substantive due process rights. He also claims that the Board should be liable for the individual defendants' actions under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978). Likewise, he claims that Brown and Hollman should be liable for Frye's conduct as his supervisors.

For the reasons stated below, I find that Lininger has not demonstrated a genuine issue of material fact as to the constitutional claims' merits. I therefore need not determine the Board's *Monell* liability or Brown and Hollman's supervisory liability. *See Doe v. Claiborne Cty., Tenn. ex rel. Claiborne Cty. Bd. of Educ.*, 103 F.3d 495, 505 (6th Cir. 1996) (explaining "[t]he threshold determination" *vis-à-vis* supervisory liability "is whether [a defendant's conduct] amounts to a constitutional violation"). Nor do I determine whether the individual defendants enjoy qualified immunity from Lininger's claims.

---

[14] Lininger's teammates' statements also complained about other conduct, such as ignoring injuries and encouraging fighting, that Lininger does not allege is sex harassment. (*See* Doc 34-1 at 2-7).

## 1. Lininger's Equal Protection Claim Fails Because
## He Did Not Suffer Discrimination Based on His Sex

"To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class." *Jachyra v. City of Southfield*, 97 F.3d 1452, 1996 WL 520795, *3 (6th Cir.) (quoting *Henry v. Metro. Sewer Dist.*, 922 F.3d 332, 341 (6th Cir. 1990) (internal quotations omitted)). To prove his equal protection claim, Lininger "must state a prima facie case of sex discrimination." *Id.*; *Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 794-95 (6th Cir. 2000).

The Board, Brown, and Hollman argue that Lininger's equal protection claim fails because he has not shown that "any alleged act or omission by defendants was based upon his gender." (Doc. 45 at 25). Similarly, Frye argues that Lininger has not shown that he is a member of a protected class. (Doc 44 at 25-28).

In accordance with my above analysis, I agree with the Board, Brown, and Hollman that Lininger has not shown that he suffered sex-based harassment. Moreover, he has not alleged that he suffered discrimination based on any other protected characteristics. Accordingly, Lininger's equal protection claim, like his Title IX claim, fails. *See Morris*, *supra*, 201 F.3d at 794-95 (affirming dismissal of § 1983 equal protection claim where plaintiff failed to prove Title VII sex harassment).

## 2. Lininger's Substantive Due Process Claim Fails Because He
## Has Not Shown Defendants' Conduct Shocks the Conscience

"Substantive due process is 'the doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed.'" *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014) (quoting *Pearson v. City of Grand Blanc*, 961 F.2d 1216 (6th Cir. 2002)). "There are two types of substantive due process claims: 1)

deprivations of a particular constitutional guarantee; and 2) actions that 'shock the conscience.'" *Blythe v. Schlievert*, 245 F. Supp. 3d 952, 956 (N.D. Ohio 2017) (Carr, J.) (quoting *Valot v. Se. Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1228 (6th Cir. 1997) (internal quotations and additional citation omitted)).

Apparently attempting to proceed under both theories, Lininger cites "the right to be free of invidious sex discrimination at the hands of the state" in his briefs. (Doc. 63 at 43; Doc. 64 at 15 (quoting *Claiborne Cty., Tenn. ex rel. Claiborne Cty. Bd. of Educ.*, *supra*, 103 F.3d at 506 (internal quotations omitted)). But he raised only a shock-the-conscience claim in his complaint.[15] *See Braley v. City of Pontiac*, 906 F.2d 220, 225-26 (6th Cir. 1990) (evaluating only shock-the-conscience claim where "complaint allege[d] no violation of a specific constitutional guarantee"); *Blythe*, *supra*, 245 F. Supp. 3d at 957 (same) (citing *Rochin v. California*, 342 U.S. 165, 211 (1952)). I therefore determine only whether Lininger's shock-the-conscience claim can survive summary judgment.

"The 'shocks the conscience' standard is difficult to satisfy. To shock the conscience, the conduct must be 'so egregious' that it can be said to be 'arbitrary in the constitutional sense.'" *Blythe*, *supra*, 245 F. Supp. 2d at 957 (internal quotations omitted) (quoting *Ewolksi v. City of Brunswick*, 267 F.3d 492, 510 (6th Cir. 2002)). "Conduct shocks the conscience if it 'violates the decencies of civilized conduct.'" *Range*, *supra*, 763 F.3d at 589 (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998)). "Such conduct includes actions 'so brutal and offensive that they do not comport with traditional ideas of fair play and decency.'" *Id.* at 589-90 (internal citations omitted).

---

[15] Moreover, and as explained previously, Lininger did not suffer from sex discrimination.

To determine whether defendants' conduct meets this standard, I evaluate the totality of the circumstances. *Range*, *supra*, 763 F.3d at 591.

### a. Lininger Does Not Identify a Physical Injury Defendants Caused

The Sixth Circuit generally "resist[s] application of the 'shocks the conscience' standard to § 1983 cases not involving physical force. *Callihan v. Sudimack*, 117 F.3d 1420, 1997 WL 1420, *3 (6th Cir.).

Defendants argue that, because Lininger suffered no physical injury, I should dismiss the substantive due process claim. (Doc. 45 at 25-28). Lininger responds that no such injury is necessary here because, he claims, defendants acted intentionally and with deliberate indifference.[16] (Doc. 64 at 43-44). I disagree.

First, Lininger provides no authority that defendants' allegedly intentional conduct warrants setting aside the usual physical injury requirement. Second, the Sixth Circuit has explained that intentional conduct does not always "rise to the level of a constitutional violation." *Braley*, *supra*, 906 F.2d at 226.

Notwithstanding the lack of a physical injury,[17] Lininger has not identified conscience-shocking conduct.

---

[16] Lininger does not respond to the Board, Brown, and Hollman's argument that Frye's allegedly callous approach to Lininger's football injuries does not shock the conscience. (*See* Doc. 45 at 29-30). I therefore decline to discuss whether Frye's response to Lininger's injuries violated his substantive due process rights.

[17] Lininger does not argue that defendants caused football-related injuries he sustained while playing for Frye.

### b. Frye's Conduct Does Not Shock the Conscience

Lininger, citing Title IX authority, argues that Frye's "harassment" shocks the conscience. He claims that a series of factors, such as Frye and Lininger's coach-student relationship, demand such a finding. (Doc. 64 at 16-18 (citing U.S. Dep't of Educ., *Revised Sexual Harassment Guidance*, 6-7; *Davis*, *supra*, 526 U.S. at 653)).

Critically, the "shocks the conscience standard" does not apply in Title IX cases. Lininger admits as much in his brief. (*See* Doc. 64 at 15). Moreover, though the factors Lininger cites are relevant to my analysis, the totality of the circumstances indicates Frye's conduct does not shock the conscience.

Lininger points to only Frye's insults as the basis of his substantive due process claim against Frye. But courts resist finding a substantive due process violation based on insults alone. *See, e.g.*, *L.H. v. Pittson Area Sch. Dist.*, 666 Fed. App'x 213, 217 (3d Cir. 2016) ("[V]erbal abuse is normally not a constitutional violation[.]") (internal quotations and citation omitted); *Abeyta ex rel. Martinez v. Chama Valley Indep. Sch. Dist., No. 19*, 77 F.3d 1253, 1258 (10th Cir. 1996) ("[E]ven extreme verbal abuse typically is insufficient to establish a constitutional deprivation.") (internal citation omitted).

In *L.H.*, *supra*, a teacher verbally insulted plaintiffs' thirteen-year-old son, telling him to "shut up," that she "[couldn't] stand him," and that the student would "have the worst year ever," and suggesting he had Tourette's Syndrome. *Id.* at 215. The Third Circuit, affirming summary judgment for the school district, held that this conduct did not shock the conscience. *Id.* at 217.

Even worse, in *Abeyta ex rel. Martinez*, *supra*, a teacher called a twelve-year-old girl a prostitute in front of her class, asked the class if they thought the student was a prostitute, and continued to call her a prostitute over one and one-half months. The court, reversing a summary

judgment denial, explained those "actions. . . do not reach the [conscience-shocking] level—whether they were done with indifference or deliberate intent to cause psychological harm." *Id.* at 1258.

Here, Lininger endured Frye's insults as a high-school varsity football player. He interacted with Frye on the practice and playing field in an ultra-competitive, highly physical sport, not in the nurturing classroom environment. Considering this context, I find that Frye's language does not shock the conscience.

### c. The Remaining Defendants' Conduct Does Not Shock the Conscience

Lininger claims the remaining defendants' response to the December, 2015 complaints violated his substantive due process rights.

Lininger bears the burden to show that the defendants' conduct was "inspired by malice or sadism . . . amount[ing] to a brutal and inhumane abuse of official power literally shocking to the conscience." *Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 1987) (internal citations omitted). He has not pointed to any evidence of malice.

Brown and the Board relied on Board counsel to engage a competent independent investigator in response to the December, 2015 complaints. They engaged Dr. Knapke, a Ph.D.-educated former superintendent with at least some investigation experience, on counsel's recommendation. The Board and Brown then relied on Dr. Knapke, working with their counsel, to conduct a full investigation. Dr. Knapke went on to interview players, parents, coaches, and team medical staff. Even if Dr. Knapke's investigation was imperfect (for example, by interviewing the wrong players or asking the wrong questions), selecting him and trusting his expertise (including by denying the appeal) does not shock the conscience.

Lininger complains that Dr. Knapke did not interview him during the investigation. But Lininger, unlike his complaining teammates, did not respond to Chisholm's questionnaire. Indeed, Lininger testified that he "didn't want to be involved" in the investigation. (Doc. 39 at 65).

Likewise, Lininger grieves Brown and Hollman's failure to supply information he believes Dr. Knapke should have used in his investigation, including the Harassment Policy and Frye's disciplinary history. Dr. Knapke concluded in his report that the students' complaints did not accord with the interview results, not that harassment did or did not occur as that term is defined in the Harassment Policy. Further, the appeal letter[18] did not protest Dr. Knapke's failure to apply the Harassment Policy. Similarly, while Frye's disciplinary history could have informed Dr. Knapke's investigation, it does not foreclose Dr. Knapke's conclusion.

I therefore do not find that the failure to interview Lininger or provide Dr. Knapke with the information Lininger deems essential to the investigation shocks the conscience.

Moreover, even if the Board should have hired a different investigator, given him or her the Harassment Policy and more information about Frye's background, or required a more exhaustive investigation, Lininger has not shown malice. At best, he complains of an imperfect, negligent, investigation. Negligence is not conscience-shocking. *See Braley*, *supra*, 906 F.2d at 226 (explaining negligence does not result in a substantive due process violation).[19]

---

[18] The appeal letter also does not cite Dr. Knapke's failure to interview Lininger (though it does complain generally of his failure to interview "several students [the fathers] identified . . . as persons with key information"). (Doc. 35-3 at 19).

[19] Lininger also complains that "Brown did not know that he was prohibited from releasing Lininger names to third parties or from discussing a harassment complaint." (Doc. 63 at 45). He does not explain how this lack of awareness violated his due process rights. Moreover, Brown disclosed the names to Frye to notify him of the nature of the allegations against him, and nothing in the record indicates Brown disclosed the names to the public directly. (Doc. 40 at 222

Finally, Lininger argues that the Board violated his due process rights when it rehired Frye despite his disciplinary history and, after his rehire, failed to monitor him. This argument is unfounded.

Frye was a successful coach and what St. Marys appeared to want most for its school. True, his disciplinary history contained complaints about his behavior, and even a criminal complaint. But his application materials also contained recommendations from the districts that handled those complaints and a state Coach of the Year Award. While the Board (and Brown) might have investigated Frye's record further, Frye's hire does not shock the conscience in light of his reputation for success. *Braley*, *supra*, 906 F.2d at 226.

Moreover, Brown, a Board member, and Hollman, Frye's supervisor, both monitored Frye. (Doc. 40 at 57). That the Board did not meet the level of supervision Lininger would have liked does not shock the conscience.[20]

I therefore find that the Board, Brown, and Hollman did not violate Lininger's due process rights.

### c. State Law Claims

Lininger raises a common law claim against the individual defendants for gross negligence, bad faith, reckless, wanton and intentional conduct; claims for intentional infliction of emotional distress (IIED) and negligent infliction of emotional distress (NIED) against all

---

("[Frye's attorney] *might have* done a records request, I don't know.") (emphasis added)). I therefore do not find that Brown's decision to disclose the complaining parties' identities shocks the conscience.

[20] I also note that, in light of my finding that Frye's conduct did not shock the conscience, it would be illogical to conclude that his hire and supervision (or lack thereof), which led to that conduct, shocks the conscience.

defendants; and a claim of negligent hiring, supervision, and retention against the Board (for brevity, the negligent hiring claim).

### 1. Lininger Fails to Address Adequately the Board's Immunity from His Negligent Hiring Claim

The Board argues that it is immune from Lininger's state law claims under Ohio Revised Code § 2744.02.

Section 2744.02 grants political subdivisions immunity, subject to certain exceptions, from suits for "injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." *Id.* at § 2744.02(A)(1).

The Board argues that "[t]here is no exception to immunity for negligent hiring, supervision or retention of an employee." (Doc. 45 at 36). Lininger does not respond to this argument.[21]

In *Campbell v. Hines*, 2013 WL 7899224 (6th Cir.), the defendant argued that qualified immunity barred the plaintiff's equal protection claim. The plaintiff failed to address the qualified immunity argument in its response, so the Sixth Circuit affirmed summary judgment on that claim. *Id.* at *4. For the same reason, I grant summary judgment on Lininger's negligent hiring claim.[22]

---

[21] Lininger, in a footnote, concedes that the Board is immune from his state law claims. While it appears he concedes immunity as to the negligent hiring claim, his reference to that claim in the header of the state-law claims section of his brief creates an appearance that he is preserving it. (*See* Doc. 64 at 52). I therefore analyze the Board's immunity argument as to that claim.

[22] I also grant summary judgment for the Board on the remaining state law claims, as Lininger has conceded the Board is immune from those claims.

## 2. Ohio Law Does Not Create Standalone Claims for
## Gross Negligence, Bad Faith, Reckless Wanton, and Intentional Conduct

Lininger claims that the individual defendants violated his rights under Ohio Revised Code § 2744.03.

Section 2744.03 does not create a standalone claim. "[W]illful, wanton, and reckless conduct is not a distinct cause of action."[23] *Bradley v. City of Cleveland*, 2012 WL 775106, *3 (N.D. Ohio) (Boyko, J.) (citing *Griggy v. Cuyahoga Falls*, 2006 WL 173134 (Ohio App.) (internal quotations omitted); *see also Brown v. Whirlpool Corp.*, 996 F. Supp. 2d 623, 643 (N.D. Ohio) (Carr, J.) (quoting *Cincinnati Ins. Co. v. Oancea*, 2004 WL 1810347 (Ohio App.)). I therefore deny summary judgment on this claim.

## 3. The State Law Claims Against Frye Fail

Frye argues that no genuine issue of material fact exists respecting the IIED and NIED claims against him. I agree.

### a. IIED

To succeed on an IIED claim, a plaintiff must show:

> (1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff, (2) that the actor's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community, (3) that the actor's actions were the proximate cause of the plaintiff's psychic injury, and (4) that the mental anguish suffered by the plaintiff is serious and of a nature that no reasonable man could be expected to endure it.

*Burkes v. Stidham*, 668 N.E.2d 982, 989 (Ohio App. 1995).

---

[23] Such conduct may, however, create an exception to immunity. *Bradley*, *supra*, 2012 WL 775106 at *3.

Frye argues that his conduct was not extreme and outrageous. (Doc. 42 at 27-28). Lininger, in response, argues that "application of context is crucial." (Doc. 64 at 26). He claims that Frye's disciplinary record, coupled with his role as a high school coach overseeing minor players, makes his conduct "extreme and outrageous." (*Id.*). I agree with Frye.

Ohio courts look to the Restatement (Second) of Torts § 46 for guidance on IIED claims. *See Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers of Am.*, 453 N.E.2d 666, 671-72 (Ohio 1983). Comment d. to that section explains that "liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."

In *Teare v. Independence Local School District Board of Education*, 2011 WL 463322, *12 (N.D. Ohio) (White, M.J.), the court denied summary judgment on an IIED claim when a teacher told her thirteen-year-old pupil that her "family is going to hang from in the front yard as the city cheers as your bodies burn."

Conversely, here, none of the insults Lininger cites threatened his or his family's safety. Likewise, the context (which Lininger says I should consider) does not indicate Frye's conduct was outrageous (just as it did not indicate Frye's conduct shocks the conscience). Frye directed vulgar language toward a high school varsity athlete on the football field and in the locker room, not toward a young girl in the classroom. Accordingly, his language does not rise to the level of extreme and outrageous conduct.[24]

I therefore grant summary judgment on the IIED claim against Frye.

---

[24] Lininger does not cite Frye's approach to injuries in his IIED argument, so I do not consider whether that conduct was extreme and outrageous. (*See* Doc. 64 at 25-26).

**b. NIED**

> To make out a claim for negligent infliction of emotional distress ("NIED") under Ohio law, a plaintiff must show that: (1) the plaintiff was in fear of a real, imminent, physical danger; (2) the physical danger was caused by the defendant; (3) the plaintiff's apprehension of this danger caused the plaintiff to suffer emotional distress; (4) the emotional distress suffered by the plaintiff was reasonably foreseeable; and (5) the emotional distress suffered by the plaintiff was "both severe and debilitating," meaning that "a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case."

*Walker v. Crawford*, 1999 WL 33917846, *5 (N.D. Ohio) (O'Malley, J.).

Ohio law "limit[s] recovery for negligent infliction of emotional distress to instances where the plaintiff has either witnessed or experienced a dangerous accident or appreciated the actual physical peril." *Heiner v. Moretuzzo*, 652 N.E. 2d 664, 669 (Ohio 1995).

Frye argues that Lininger cannot meet the first element "because the alleged physical danger was not real or imminent unless every student voluntarily participating in high school sports in which injury <u>could</u> occur qualifies." (Doc. 42 at 29). Lininger responds that he need not "show a contemporaneous physical injury in order to establish a claim for NIED." (Doc. 64 at 26).

Lininger mischaracterizes Frye's argument. That Lininger suffers emotional distress (*see* Doc. 64 at 26 (citing Doc. 59 at 138 (expert testimony regarding Lininger's emotional health)) supports the fifth element of his NIED claim. *See Walker*, *supra*, 1999 WL 33917846 at *5. Lininger does not, however, argue, or even allege, that Frye's conduct made him fear "a real, imminent, physical danger." *Id.* (*See* Doc. 1 at 31, ¶¶ 132-35). Accordingly, the first element his NIED claim fails, and I grant summary for Frye on that claim.[25]

---

[25] In light of my findings on the merits of Lininger's IIED and NIED claims, I decline to reach Frye's argument that he enjoys statutory immunity from those claims. (*See* Doc. 42 at 29-31).

**4. Brown and Hollman Are Immune from the IIED and NIED Claims**

Brown and Hollman do not dispute the merits of Lininger's IIED and NIED claims. Instead, they argue that they are statutorily immune from those claims. (Doc. 45 at 35-37). I agree.

Ohio law provides public employees immunity from civil suits, subject to certain exceptions. Ohio Rev. Code. § 2744.03(A)(6)(a)-(c). Immunity will not protect an employee where "[t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." *Id.* at § 2744.03(A)(6)(b).

Lininger argues that Brown and Hollman acted with the culpability described in § 2744.03(A)(6). (Doc. 63 at 52-54).

Under Ohio law,

One acts with a malicious purpose if one willfully and intentionally acts with a purpose to cause harm. Malice includes the willful and intentional design to do injury, or the intention or desire to harm another through conduct which is unlawful or unjustified. Bad faith is defined as a dishonest purpose, moral obliquity, conscious wrongdoing, or breach of a known duty through some ulterior motive or ill will. A person acts wantonly if that person acts with a complete failure to exercise any care whatsoever. One acts recklessly if one is aware that one's conduct creates an unreasonable risk of physical harm to another. Recklessness is more than mere negligence in that the person must be conscious that his or her conduct will in all probability result in injury.

*Spears v. Akron Police Dep't*, 2010 WL 625822, *4 (Ohio App.) (internal quotations and citations omitted); *see also Shively v. Green Local Sch. Dist. Bd. of Educ.*, 579 Fed. App'x 348, 359 (6th Cir. 2014) (quoting *id.*).

"[R]ecklessness is a perverse disregard of a known risk." *Shively*, *supra*, 579 Fed. App'x at 359 (quoting *O'Toole v. Denihan*, 889 N.E.2d 505, 517 (Ohio 2008)). "The question of recklessness turns on whether Defendants knew of and could foresee harm to a student and whether they took actions in response to the harassment." *Id.* at 359-60.

Lininger, citing *Shively*, *supra*, argues that Brown and Hollman made a "deliberate decision not to enforce school policies against bullying," and they therefore are not immune from his claims.

The Sixth Circuit in *Shively* found that school administrators acted recklessly because they failed to respond to bullying complaints. The *Shively* plaintiff's daughter suffered bullying for years; her classmates called her names like "dirty Jew," told her to "rot in Hell," put her name on a "kill list," and stabbed her with a pencil, among other things. *See* 579 Fed. App'x at 350-51. But, when plaintiff complained to school administrators, they did nothing – and one even suggested her daughter "enjoyed the attention" – though a bullying policy required them to address the bullying. *Id.* at 358. Finding this "deliberate decision not to enforce school policies" was reckless, the court affirmed the district court's decision to deny immunity. *Id.* at 360.

Here, in contrast, Brown responded immediately to the December, 2015 complaints about Frye. *Cf. also Estate of Olsen v. Fairfield City Sch. Dist. Bd. of Educ.*, --- F. Supp. 3d ----, 2018 WL 4539440 (S.D. Ohio) (denying immunity to school administrators and staff who did not respond to complaints of bullying and who took no action despite witnessing a student slap the victim). Indeed, Brown relied on Board counsel to select a competent investigator, who went on to conduct two days of interviews and produce a report of his findings.

As explained, Brown and Hollman may have been negligent in failing to give Dr. Knapke the Harassment Policy and Frye's disciplinary history. But negligence does not undermine statutory immunity. *See Riehm v. Green Springs Rural Volunteer Fire Dep't*, --- N.E.3d ----, 2018 WL 4896391 (Ohio App.). Nor does Dr. Knapke's failure to interview Lininger require setting aside immunity; Lininger neither complained about Frye nor wanted to be part of the investigation.

Likewise, Lininger has not shown that Brown acted maliciously, in bad faith, wantonly, or recklessly when recommending Frye to the Board. First, I note that Lininger has not raised a negligent hiring claim against Brown, and his argument about Frye's hire fits better in that type of claim. Next, as explained in my substantive due process analysis, Brown used the "known factor" when recommending Frye; he pursued Frye because of his prior successes. (*See* Doc. 40 at 102). Moreover, Brown did at least some investigation into the discipline in his record.

Finally, after the Board hired Frye, Brown and Hollman monitored him. (*See* Doc. 40 at 57). Brown's investigation and his decision to monitor Frye contradict Lininger's argument that Brown perversely disregarded his safety.

Further, Lininger's argument that Brown's failure to keep his father's identity in the December, 2015 complaints confidential abrogates immunity is meritless. Brown provided Lininger's name to Frye only, and he did so to inform him about the allegations against him. Further, Lininger only speculates that Brown did not redact the complaining parents' names in response to Frye's attorney's hypothetical records request. (*See* Doc. 63 at 18 (explaining that "Brown thought [the attorney] *may have* obtained the [complaint] . . . by requesting public records from the school) (emphasis added)). But nothing in the record indicates that any such request occurred or that Brown failed to redact confidential information in response to such a request.

Lininger has not identified facts to overcome Brown and Hollman's statutory immunity. I therefore grant summary judgment on his state law claims against them.

**Conclusion**

It is, therefore, ORDERED THAT

Defendant Paul Douglas Frye's motion for summary judgment (Doc. 42) and defendants

St. Marys City School District Board of Education, Shawn Brown, and James Hollman's motion

for summary judgment (Doc. 45),  be, and the same hereby are, granted.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge